UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

PAUL MCCARTNEY,
CRAIG COLLOPY,
JEAN PIERRE SYLVESTRE,
JOSEPH TRANCHO,
CHRISTOPHER ECKERT

                                        Plaintiffs,

            -against-


CITY OF NEW YORK, ERIC ADAMS,
DAVID CHOKSHI

                                        Defendants

**COMPLAINT**

Case no. 23-cv-8232

Jury Trial: ☒Yes      ☐No

1

## PRELIMINARY STATEMENT

*"Since March 2020, we may have experienced the greatest intrusions on civil liberties in the peacetime history of this country. Executive officials across the country issued emergency decrees on a breathtaking scale."*

-Justice Neil Gorsuch

When there is no margin of error, and time is of the essence, members of two specialized, elite units within the New York City Police Department (NYPD) are ready to save the day. The first is the Bomb Squad. The second is the Emergency Service Unit (ESU). While both units perform different functions, the highly trained members on each team are prepared to sacrifice their lives if necessary, to save others.

The Bomb Squad (Unit) is an extremely specialized division within the NYPD's Counterterrorism Bureau. The Bomb Squad is responsible for responding to and mitigating threats from explosive devices within New York City. As of 2018, there were only 3,100 bomb technicians in the entire country.[1] Every new member of the Bomb Squad must first complete six (6) weeks of intensive training in Huntsville Alabama at the Federal Bureau of Investigation's (FBI) Hazardous Device School (HDS). The facility housing the HDS has numerous classrooms and mock towns. Bomb Technicians in training learn about electricity, fuses, improvised explosive devices and practice defusing explosive devices in a myriad of different scenarios based on real life threats. Everyone selected to attend HDS must be proficient enough

---

[1] https://www.fbi.gov/news/stories/hazardous-devices-school (accessed November 2, 2023).

for the FBI to certify them to handle explosive devices. In addition, Bomb Technicians must be re-certified every three (3) years. They are consistently learning and training to deal with new, emerging threats in an ever-changing landscape.

The NYPD's Bomb Squad is always watching over the public. Ensuring that they are safe from devastating harm.  Its members mostly operate out of the public's view. The Bomb Squad is responsible for protecting everyone living and visiting New York City (City or NYC) from tremendous danger, concealed in small places. When a bomb or explosive device is discovered, members of the Unit utilize extremely specialized training to defuse it. The Bomb Squad's expertise, however, is in providing the highest level of security. The Unit's success is manifest when there are no explosive devices to defuse. Craig Collopy and Joseph Trancho were members of the Bomb Squad. Jean Pierre Sylvestre was a member of both the ESU and Bomb Squad. These men have the heart of a soldier and the hands of a surgeon.

The NYPD's Emergency Service Unit (ESU) is an elite, specialized unit within the NYPD's Special Operation Bureau. ESU members respond to an array of different situations involving barricaded suspects, hostages, high-risk apprehension, hazardous material threats, suicide attempts, structural collapses, and emergency disasters. The ESU's rigorous training program lasts for seven and a half months. Only about thirty-five (35) applicants are selected out of three hundred fifty (350). All ESU members are certified as divers and emergency medical technicians. ESU members are trained in special weapons and tactics (SWAT) as well as technical rescue operations. Paul McCartney and Christopher Eckert were members of the

ESU. When lives were on the line, they answered the call. Plaintiffs are nothing short of heroes, even though they are too humble to acknowledge it.

These five (5) men's identities were inseparable from their careers. Being a hero is a full-time job. One thing all heroes have in common is the passion and ability to help the helpless. It is innate. It is who they are and who they will always be. It did not disappear when their tours ended.  Plaintiffs were going to spend their entire careers with the NYPD. Eric Adams and David Chokshi had other plans.

Eric Adams and David Chokshi are responsible for the most egregious, unconstitutional COVID-19 policies in the United States of America. Defendants blatantly and unapologetically eviscerated Plaintiff's civil liberties in plain view. Fear paralyzed the public as the City Plaintiffs defended used a public health crisis to trample on their civil rights. Eric Adams ruled with an iron fist. There was no velvet glove covering it though. Adams and Chokshi discriminated against City employees with impunity. When Plaintiffs needed to be saved, no one came to their rescue.

David Chokshi arbitrarily ordered only Plaintiffs to get vaccinated against COVID-19 in 2021 (Mandate or Vaccine Mandate) during an outbreak that spread throughout the City like wildfire in 2020. Why Plaintiffs? Because they were public servants employed by the City. Chokshi made employment status the decisive factor for compulsory vaccination during a City-wide outbreak of disease. Unvaccinated members of the public had a choice to get the shot. But not unvaccinated Plaintiffs. For Plaintiffs, the penalty for noncompliance was termination. That is no choice at all.

4

The City controlled the narrative and news media outlets did not dare to question it. They ignored the Mandate's dangerous, far-reaching implications staring them in the face. If Chokshi could justify compulsory vaccination based on an arbitrary label such as employment status, then what is to stop him or future commissioners from using other arbitrary labels such as race, socioeconomic status, sex, hair color, income, and gender identity for example to justify public health mandates in the future? Nothing. The government learned that it could weaponize fear to compel obedience. The Constitution did not deter it. Even worse, no vaccine stopped the transmission of COVID-19 and Chokshi knew it. Adams did as well. Chokshi's Mandate was only the beginning though.

Eric Adams removed whatever façade of legitimacy remained when he amended the Mandate to exclude professional athletes, performers, and their entourages (Elite Exemption or Elite Carveouts). He unabashedly justified his Elite Exemption because it brought more money into the City, improved morale, benefited his donors, and helped New York sports teams compete against visiting teams with unvaccinated players. Considerations that have absolutely nothing to do with public health.

The worst part though, was that Adams continued to enforce the Mandate against Plaintiffs and other unvaccinated City employees. Why? To set an example—amongst other reasons discussed *inter alia*. Anyone who "defied" Adams by not doing what he said was the "right thing" would be dealt with swiftly and harshly. This tactic is not new. Some of the most infamous dictators in the world have used it to force its citizens to be subservient subjects. It is the first time in modern history however, that these

tactics were employed on American soil. There is nothing more antagonistic to our Constitutional Republic and the freedoms enshrined in the Constitution.

Defendants took everything from Plaintiffs. Defendants took away Plaintiffs' careers, identities, access to their full pensions, benefits, and job security. Plaintiffs defended freedom itself. They fought to preserve it from enemy attacks. Conversely, Defendants trampled on their civil liberties without hesitation. And the voices in opposition were silenced by most New York Courts and the media alike. The Constitution does not go out the window in times of public emergencies. Several Supreme Court Justices have expressly recognized what several courts in New York State have ignored. COVID-19 was not a workplace hazard. It was everywhere people gathered in public. Plaintiffs directly challenge what is not in this Court's province to weigh in on: no vaccination stopped transmission of the Virus.

Eric Adams and David Chokshi are the worst of the executive officials in this country who issued emergency decrees since 2020. Most of the public falsely believes that Chokshi helped the City. Adams has avoided scrutiny and accountability. It is time to pull the veil off of this false narrative. These two men committed atrocities that are not only unconstitutional, but unacceptable in contemporary America. Brave public servants like Plaintiffs are not sacrificial lambs for two men to further their own ambitions. A public health crisis cannot be used as a cover to trample on people's civil rights. Plaintiffs have families. Most of them have children. They dedicated their lives to helping keep the City and this Country safe. The City showed its gratitude by crushing their civil liberties. This is not how their story ends.

COVID-19 might be in the rearview mirror for most people. But the wounds Chokshi and Adams inflicted upon Plaintiffs have not healed. Adams and Chokshi must be held accountable. History books will not regurgitate the curated, false narrative the government has perpetuated. Injustice anywhere is a threat to justice everywhere.

Accordingly, Plaintiffs commence this action against the City of New York, Eric Adams in his personal capacity, and David Chokshi in his personal capacity for violating the Equal Protection Clause, Plaintiffs' Substantive Due Process rights, and the Takings Clause.

## PARTIES

1. Paul McCartney was at all relevant times herein employed by the City of New York as a member of the NYPD. Mr. McCartney is a United States citizen.

2. Craig Collopy was at all relevant times herein employed by the City of New York as a member of the NYPD. Mr. Collopy is a United States citizen.

3. Jean Pierre Sylvestre was at all relevant times herein employed by the City of New York as a member of the NYPD. Mr. Sylvestre is a United States citizen.

4. Joseph Trancho was at all relevant times herein employed by the City of New York as a member of the NYPD. Mr. Trancho is a United States citizen.

5. Christopher Eckert was at all relevant times herein employed by the City of New York as a member of the NYPD. Mr. Eckert is a United States citizen.

6.  At all relevant times herein Defendant New York City is a municipal corporate entity created and authorized under the laws of the State of New York, with its principal offices located at the Municipal Building, One Centre St., New York, NY 10007.

7.  At all relevant times herein, Eric Adams was the Mayor of the City of New York, was acting under color of law, and was responsible for amending, executing, and enforcing the Vaccine Mandate. Eric Adams is responsible for setting and overseeing the policies of the City and the manner in which they are maintained, applied, and enforced. Eric Adams acted at all times under color of law in the acts attributed to him herein. Mayor Eric Adams' office is located at 1 City Hall, New York, NY 10007.

8.  At all relevant times herein David Chokshi was acting under color of law as the Commissioner of the New York City Department of Health and Mental Hygiene and created the Vaccine Mandate. David Chokshi was at all times relevant hereto responsible for creating the vaccine mandates, disseminating information regarding COVID-19 to the public, overseeing the New York City Department of Mental Health and Hygiene, and creating all public health policies.

## JURISDICTION AND VENUE

9.  This Court has original jurisdiction pursuant to 28 U.S.C. §1331. Pursuant to 28 U.S.C. §1343 this Court has original jurisdiction. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

10. The United States District Court for the Eastern District of New York is the proper venue pursuant to 28 U.S.C. §1331 (b)(1) and (b)(2) as it is the judicial district in which Defendants deprived Plaintiffs of their rights under the Constitution of the United States and it is where a substantial part of the events giving rise to Plaintiffs claims occurred.

<u>STATEMENT OF FACTS</u>

11. Detective Paul McCartney (McCartney) exemplifies the extraordinary, diverse skills and attributes expected of members in the NYPD's Emergency Services Unit. Mr. McCartney enlisted in the United States Marine Corps after graduating from high school in 2000. He served a tour in Iraq. The United States Marine Corps awarded Mr. McCartney the Navy Achievement Medal for Operation Iraqi Freedom. Mr. McCartney was determined to work for the NYPD. He took the NYPD exam after the United State Marine Corp honorably discharged him on November 1, 2004. Mr. McCartney temporarily worked in a Deli while waiting for a position with the NYPD. In 2005 he received the call from the NYPD. In 2012, Mr. McCartney earned a coveted position in the ESU. One day, a nineteen-year-old man stood on the edge of the Throgs Neck Bridge. He was attempting to commit suicide. Mr. McCartney persuaded the young man to step down from the ledge. Mr. McCartney saved the young man's life. On April 12, 2022, when Frank James fired shots at innocent civilians on a crowded subway car Detective McCartney played a pivotal role in his apprehension. Detective McCartney was one (1), out of six (6) permanent members on the ESU Apprehension Team.

Detective McCartney's achievements did not go unnoticed. The NYPD awarded him the Meritorious Police Duty Medal. The medal is awarded to officers who have demonstrated exceptional acts of bravery, heroism, or dedication to their duties. This medal is one of the NYPD's highest honors and is typically awarded for actions that go above and beyond the call of duty. In addition, The NYPD awarded Detective McCartney with the medal for Excellent Police Duty three (3) times. This distinction is awarded to officers who have demonstrated exceptional skill, bravery, and dedication in the line of duty. To receive this medal, officers typically need to show consistent outstanding performance and valor, often in challenging or high-stress situations. The City terminated Detective McCartney in July 2022.

12. Sergeant Craig Collopy (Collopy) was a Training Sergeant and supervised a team of Bomb Technicians within the NYPD's Bomb Squad. He had worked for the NYPD since 1995 and was the third most senior member of the Bomb Squad. After the terrorist attacks on the World Trade Center, the NYPD intensified its efforts to recruit the most fit members from its ranks into the Bomb Squad. Mr. Collopy holds the distinction of being the only member selected into the Bomb Squad right from a precinct. Mr. Collopy entered the Bomb Squad as a Detective. He responded to a plethora of situations involving explosive devices. After only five (5) years, he was promoted to Sergeant. Since then, Sergeant Collopy has supervised response teams. Every response team is comprised of four (4) detectives. The most senior detective is the team leader. Sergeant Collopy was in charge of the response team. Sergeant Collopy was only one (1) out of six (6) Sergeants in the entire Bomb

Squad. In addition, the NYPD tasked Sergeant Collopy with coordinating training. Sergeant Collopy organized training schools and events involving hundreds of Bomb Technicians. Sergeant Collopy, watched from afar to make sure those he taught were safe in the field. Less experienced members of the Bomb Squad often sought his advice and guidance. The City forced Sergeant Collopy to retire early. His last day was May 30, 2022.

13. Detective Jean Pierre Sylvestre (Sylvestre) was at the pinnacle of his career before the defendants took it away. A Marine Corps veteran, Mr. Sylvestre fought for this country in Iraq and Kuwait after the attack on the World Trade Center. He joined the NYPD in 2002 excited to fight terrorism. He advanced into NYPD's Special Operation Bureau working in the Emergency Services Unit (ESU). While working in the ESU, Mr. Sylvestre saved a man's life as he suffered a heart attack. The man's son watched as Mr. Sylvestre brought his father back to life. One of Mr. Sylvestre's fondest memories is receiving a letter of gratitude from the man's son. It's a story he shares with his own sons. Mr. Sylvestre waited eighteen (18) years for the Bomb Squad to accept his application. Detective Sylvestre performed tremendously during training. He finally made it to the Bomb Squad. As a distinguished Marine and Detective in the NYPD's elite ESU his dream had become a reality. He had finally made it to the Bomb Squad. His hard work, patience and commitment to the public had paid off. After only two short years in the Bomb Squad and twenty (20) years of service with the NYPD, the City terminated him in June 2022.

14. Detective Joseph Trancho (Trancho) protected and served the community he grew up in. Detective Trancho was born and raised in Flatbush Brooklyn. He looked up to the police and knew that it was his calling. In 1995, Detective Trancho began his career with the NYPD. In his first ten years (10) of service Detective Trancho worked in Brooklyn where he grew up. Detective Trancho's history, experience, and interactions within the community helped earn the public's trust and lower crime. In 2005 the NYPD selected Detective Trancho into the Bomb Squad. The NYPD recognized Detective Trancho's proficiency by promoting him to detective, second grade. The promotion was discretionary. As a Second Grade Detective, Detective Trancho was given the responsibility of being a team leader. He served immediately under the Sergeant in charge and oversaw the other detectives assigned to his team. In addition, Detective Trancho was one—out of a few— members in the Bomb Squad trained to work with canines specialized in sniffing out explosive devices. Detective Trancho worked with two canines during his time in the Bomb Squad. He—and his wife—took care of them like parents care for their children. The bond between a Bomb Technician and his or her canine is so unique that it can never be severed. After eighteen (18) years defending the City in the Bomb Squad, Detective Trancho was the second most senior Detective. Six months after the City terminated him in June 2022, two less senior Detectives were promoted to detective first grade. If the City had not terminated Detective Trancho he would have been promoted to detective, first grade. The City lost not only Detective Trancho, but his canine as well.

15. Lieutenant Christopher Eckert (Eckert) always wanted to work in law enforcement. His father was a New Jersey State Trooper and Mr. Eckert's role model. Mr. Eckert saw law enforcement as a noble calling. He had a passion for helping people and working on teams. Mr. Eckert is a natural born leader. He has a Bachelor of Arts degree in art history from East Stroudsburg University. After graduating from college, he applied for a position as a police officer with the NYPD. In 2002 Mr. Eckert began his career with the NYPD as a uniformed member of service in Sunset Park, Brooklyn. In 2008 he was promoted to Sergeant. In 2014 Mr. Eckert joined the NYPD's elite ESU. He was one (1) out of forty-eight sergeants in the ESU. Then, in 2016 Eckert was promoted to Lieutenant after graduating from the NYPD's one month long Superior Officer School. Lieutenant Eckert subsequently worked directly under the captain in the NYPD's Personnel Division. Working in the Personnel Division gave Lieutenant Eckert the opportunity to help the public by building a better NYPD. He was tasked with ensuring that the NYPD was prepared to face its ever-increasing challenges and further its complex mission. In 2019, the NYPD selected Lieutenant Eckert as the Integrity Control Officer. He was responsible for overseeing and ensuring the integrity and ethical conduct of NYPD personnel. This position is vital in maintaining trust and accountability within the police department. The City terminated Lieutenant Eckert in October 2022 after twenty (20) years of service.

THE PANDEMIC ENDED IN 2021

16. Over twenty (20) years after the terrorist attack on the World Trade Center, a different threat emerged. It was a virus called SARS-CoV-2 (Virus) and it caused a sickness known as COVID-19.

17. In 2020 it was deadly.

18. In 2020, thousands of people died from COVID-19 daily.

19. Luckily, by 2021 COVID-19 caused symptoms consistent with a cold or mild flu.

20. Plaintiffs still worked through the height of the pandemic in 2020.

21. In June 2021, then Governor Cuomo ended New York's declared state of emergency.

22. Still, Plaintiffs were required to test weekly and wear a mask while their colleagues were not subject to the same requirements.

23. The weekly testing and forced mask requirement were a constant reminder to Plaintiffs, and their colleagues, that they were not vaccinated.

24. Teamwork and solidarity are essential in the Bomb Squad and the ESU. The disparate treatment created an invisible barrier between Plaintiffs and their colleagues.

THE CITY'S RESPONSE AFTER THE WORSE OF THE PANDEMIC ENDED.

25. In August of 2021, then Mayor Bill De Blasio issued Executive Order No. 78. This Order required City employees to either show proof of vaccination or to submit proof of a negative COVID-19 PCR test.

26. Executive Order No 78 went into effect on September 13, 2021.

14

27. The fall of 2021 was completely different than the fall of 2020. Significantly less people were dying from COVID-19.

28. The Virus had mutated multiple times.

29. The risk of contracting COVID-19 existed in every public place people in the City gathered.

30. There was still an outbreak of the disease covering the entire City.

31. COVID-19 was not isolated to the workplace or any location. It was everywhere.

32. In September 2021, the Food and Drug Administration (FDA) granted the first Biologics License Application (BLA) for any COVID-19 vaccine. A pharmaceutical company named Pfizer-BioNTech (Pfizer) developed and manufactured a vaccine (Vaccine or COVID Vaccine or Shot).  Other vaccines remained available under emergency use authorization.

33. Defendants touted the Vaccine as safe and effective.

34. No medicine—whether over the counter or prescribed—is safe and effective for everyone.

35. The Vaccine was never intended to stop the transmission of the Virus.

36. Alternatively, the Vaccine—at best—targeted only the original, Alpha strain of the Virus.

37. Nevertheless, Defendants told the public that the vaccine would prevent COVID-19.

38. No Vaccine stopped the strain of the Virus circulating in the fall of 2021.

39. No Vaccine stopped the transmission of any COVID-19 variants.

40. Defendant Chokshi appeared on radio advertisements and television commercials encouraging everyone to get vaccinated.

41. Chokshi gave out broad sweeping medical advice to the public for the first time in recent history. Prior to 2020, people relied on their primary care physicians for individualized, medical advice. Chokshi normalized "one size fits all" medical advice which did not account for individual needs.

42. As of October 2023, the COVID-19 "vaccine" is nothing more than another optional, seasonal shot.

43. It is no different than the flu shot.

44. It never was the panacea Defendant's falsely claimed it to be.

THE MANDATE

45. On or about, October 20, 2021, Chokshi Ordered Plaintiffs—as well as every City employee— to get vaccinated against COVID-19 (Mandate).

46. The Mandate cited Executive Order No. 78 as support.

47. The Mandate continued then Mayor De Blasio's Executive Order Number 225 titled the "Key to NYC."

48. Chokshi Ordered that any City employee who failed to get vaccinated by October 29, 2021, would—as a penalty—be excluded from their workplace beginning on November 1, 2021.

49. Chokshi ordered only City employees to get the Shot.

50. Before issuing the Mandate for all City employees, Chokshi first mandated only Department of Education (DOE) "employees, contractors, and visitors" to provide

proof of COVID-19 vaccination before entering any DOE building. Then, Chokshi Ordered all "staff of early childhood programs" to provide proof of vaccination on September 12, 2021. Thus, the Order issued on October 20, 2021, was the third proclamation mandating vaccination.

51. A little less than two months later, on December 13, 2022, Chokshi issued a new Mandate requiring private sector employees to get vaccinated (Private Sector Mandate).

52. Businesses that did not comply were subject to fines.

53. Eric Adams never enforced the Private Sector Mandate.

## THE VACCINE UTILIZED NEW TECHNOLOGY THAT MANIPULATES CELLULAR BIOLOGY

54. COVID Vaccines are not like traditional vaccines.

55. Traditional vaccines—like the polio vaccine—produce a natural immune response in human beings, by injecting them with a dead, weakened, or inactivated strain of a virus.

56. COVID Vaccines, however, build an immune response through messenger RNA (mRNA).

57. mRNA is genetic material that is made from a DNA template during the process of transcription.

58. mRNA carries information from the DNA in a cell's nucleus to a protein building ribosome.

59. There, the ribosome reads the mRNA sequence and builds amino acids into proteins.

60. Simply put, ribosomes build the stuff humans are made of.

61. These cells build the proteins that make up the building blocks of life. Accounting for the color of humans' hair, skin, eyes, and much more.

62. DNA code cannot be read by the cells that build the proteins responsible for most of humans' necessary bodily functions. mRNA acts as the translator between DNA and these protein building cells.

63. mRNA decodes DNA into instructions—like a blueprint—that the cells responsible for assembling amino acids into proteins can read.

64. COVID Vaccinations utilize mRNA to instruct the ribosome cells to build a copy of the spike proteins found on the surface of the Alpha strain of the Virus. Then, the body's cells recognize it. This triggers an immune response.

65. COVID-19 Vaccines alter its recipient's cellular biology because it manipulates ribosomes to produce spike proteins which in turn are released and trigger an immune response.

THE MANDATE DID NOT FURTHER A PUBLIC HEALTH OBJECTIVE

66. The purpose behind the Mandate was to protect the public from the transmission of COVID-19.

67. Salus populi[2] expresses a common law principal for the City's exercise of police powers.

68. The premise is simple: the government can restrain individual liberties to the extent it benefits the welfare of the people as a whole.

---

[2] Salus populi is Latin for the "welfare of the people."

69. The police powers reserved to the states and municipalities in the context of the outbreak of a communicable disease, permits compulsory vaccination because of herd immunity.

70. Herd immunity protects the public from outbreaks of disease. States like New York require children to receive enumerated vaccinations to attend school for example because it results in herd immunity.

71. Herd immunity is where a sufficiently large proportion of a population becomes immune to an infectious disease, either through vaccination or previous infection, thereby reducing the spread of the disease within the community.

72. When a large portion of the population is immune to a disease, it becomes difficult for the disease to spread because the chances of an infected person coming into contact with a susceptible person are reduced. This means that even those who are not immune to the disease, such as individuals who are unable to get vaccinated due to health reasons, are less likely to become infected because the disease has fewer opportunities to spread within the community.

73. That is, in part, because vaccinated individuals do not become infected when exposed to the virus they are vaccinated against.

74. Herd immunity is particularly important for protecting vulnerable members of the population, such as those who are immunocompromised, and for preventing outbreaks of infectious diseases. The exact percentage of the population that needs to be immune to achieve herd immunity varies depending on the disease and how

contagious it is, but generally, it is estimated that between 70% and 90% of the population needs to be immune to a disease to achieve herd immunity.

75. According to the CDC over 85% of residents in the City were fully vaccinated by April 2022.

76. As of 2022, City employees made up approximately 4.22% of New York City's entire population.

77. Yet, the Mandate applied  only to City employees—like Plaintiffs.

78. It was only enforced against Plaintiffs.

79. Even if every single City Employee was vaccinated. And even if the Vaccine stopped the Virus from spreading. Herd immunity would still be unobtainable.

80. Nevertheless, Chokshi and Adams arbitrarily required only City employees to get vaccinated.

<div align="center">VACCINE INEFFICACY</div>

81. The Virus infects all human beings.

82. People who were fully vaccinated still carried and transmitted the Virus to others.

83. These are known as "breakthrough cases."

84. Pfizer, and other pharmaceutical companies manufactured additional vaccines— in the form of booster shots—to stop the occurrence of breakthrough cases.

85. Defendants still encouraged the public to get booster shots in addition to the original Shot.

86. Booster shots did not, and do not, stop the spread of the Virus either—including its variants.

87. Chokshi himself contracted COVID-19.

88. Despite being fully vaccinated and "boosted" multiple times, President Biden, Dr. Anthony Fauci, and the Centers for Disease Control and Prevention Director Rochelle Walensky still contracted COVID-19.

89. Pfizer stated the vaccine was never tested to prevent the transmission of COVID-19. [3]

90. The Vaccine is not a vaccine at all, it is a shot—like the flu shot.

91. Both unvaccinated and vaccinated citizens presented the same risk of spreading the Virus as unvaccinated Plaintiffs.

92. It did not slow the spread of COVID-19.

93. It did not prevent COVID-19.

94. It did not protect public health.

95. It did not promote public safety.

96. Any efficacy that the Vaccine did have waned after a few months.

97. Chokshi still publicly claimed that "authorized vaccines protect us from diseases that threaten us so much more" than the side effects. [4]

98. Chokshi and Adams knew that breakthrough cases for individuals inoculated for the Measles, Mumps, Rubella and Polio, are nonexistent.

---

[3] https://apnews.com/article/fact-check-pfizer-transmission-european-parliament-950413863226 (last retrieved November 6, 2023). Linked material is provided throughout SOLELY to demonstrate to this Court that Plaintiff has a good faith basis to assert said claims. Given the plethora of competing information, Plaintiff cannot ascertain what this Court has been privy to, or what it has not. Plaintiffs are not, in any way, submitting the linked materials herein as substantive proof or evidence.

[4] https://www.nytimes.com/live/2021/04/14/world/covid-vaccine-coronavirus-cases (last retrieved March 31, 2023).

99. Chokshi and Adams knew that no Vaccine stopped the transmission of COVID-19.

100. Second, third, and fourth, boosters are not required for the aforementioned traditional vaccines.

101. Because—unlike COVID-19 Vaccines—they work.

102. The Vaccine could not stop the transmission of the multitude of variants that had emerged such as the Delta or Omicron strains.

103. Yet, Chokshi—in support of the Mandate—stated that ". . . new variants of COVID-19, identified as 'variants of concern' have emerged in the United States, and some of these new variants which currently account for the majority of COVID-19 cases sequenced in New York City, are more transmissible than earlier variants."

104. A 2020 study published in the New England Journal of Medicine concluded that the Vaccine was safe and effective.[5] The study however, noted that "[n]o vaccines that protect against betacoronavirus are currently available, and mRNA-based vaccines have not widely been tested" (*id*.). The study was funded by Pfizer and BioNTech. Even more, the data set and trial results used by the study's authors were the basis for "an application for emergency use authorization." (*Id*.).

105. Chokshi and Adams mandated Plaintiffs to receive a vaccine that could not stop the transmission of the "variants of concern" Chokshi referenced in the Mandate.

---

[5] https://www.nejm.org/doi/full/10.1056/nejmoa2034577# (last accessed October 14, 2023).

## ADAMS AMENDS THE MANDATE TO EXEMPT PROFESSIONAL ATHLETES AND PERFORMERS

106.    On or about March 24, 2022, Adams issued Executive Order No. 62 (Executive Order or Order).

107.    The Order amended the Mandate to exclude professional athletes and performers (Elite Exemption or Elite Carveouts).

108.    Adams' justification was that they travel for work and benefit the City economically since they often attract many visitors to the City. Further, New York sports teams with stadiums in the City—said the Mayor—were at a competitive disadvantage since the away teams were able to field unvaccinated players. As such, the New York sports teams were at a disadvantage. Mr. Adams decided that requiring professional athletes to get vaccinated was detrimental to the city's economy and morale of the city's residents.

109.    The Mandate still did not apply to unvaccinated residents of the City either.

110.    Indeed, Adams did not try to connect the Elite Exemption to furthering the ends of public health.

111.    On March 4, 2022, a reporter asked Adams how it is fair that unvaccinated tourists could go into any indoor place they want, but unvaccinated City Workers were terminated and were not going to get their jobs back.[6]

112.    Adams explained—in sum and substance—that a court had decided it was fair *id.*

---

[6] https://www.nyc.gov/office-of-the-mayor/news/110-22/transcript-mayor-eric-adams-makes-announcement-covid-mandates (last retrieved March 31, 2023).

113.    When asked if he could just reinstate the terminated workers, Adams responded—in sum and substance—that most New Yorkers did the "right thing" and that it would send the wrong message to folks who got the shot if the Mandate was rescinded. Adams finished by stating "[p]eople have to comply with the rule." *Id.*

114.    Members of the public frequently interact with one another.

115.    Yet, no unvaccinated private sector workers or unvaccinated members of the public were required to be vaccinated.

116.    COVID-19 is not unique to the workplace.

117.    The risk of contracting COVID-19 was present in every corner of the City.

118.    Chokshi himself acknowledged the obvious. He said "[w]e've seen how the coronavirus respects no boundaries. It doesn't respect geographic boundaries . . ."[7]

119.    Vaccination is permanent.

120.    It does not magically leave the body at the end of the workday.

121.    When Plaintiffs were not working, they were citizens just like everyone else.

122.    Except they did not have the ability to choose whether to get vaccinated.

123.    Everyone else had a choice even though the risk of contracting COVID-19 was the same in every public place people gathered.

124.    Defendants continued to enforce the Mandate until February 6, 2023.

---

[7] https://www.ny1.com/nyc/all-boroughs/inside-city-hall/2020/08/05/new-nyc-health-commissioner-dr-dave-chokshi-taking-over-for-dr-oxiris-barbot (last retrieved March 24, 2023).

PENSION AND HEALTH BENEFITS

125.   Every Plaintiff reasonably planned to work for the NYPD until they physically could not work anymore.

126.   Plaintiffs were fit for service when they were terminated.

127.   There were no impediments to Plaintiffs ability to continue working when the City terminated them.

128.   The City guaranteed that Plaintiffs would receive payments from their pension fund upon retirement.

129.   Plaintiffs pension is managed by the New York City Police Pension Fund (NYCPPF).

130.   Plaintiffs were required to make annual pension contributions until they were eligible for service retirement.

131.   Plaintiffs must work for the NYPD for twenty (20) years to be eligible for retirement.

132.   Plaintiffs contributed a fixed percentage to their pensions upon hire (Contribution Rate).

133.   Plaintiffs annually contributed to their pensions.

134.   The City paid 8.25% interest—annually—to Plaintiffs' Contribution Rate.

135.   The Contribution Rate was applied to Plaintiffs pensionable earnings during their careers.

136.   Pensionable earnings consist of base salary, overtime, night differential, holiday pay, worked vacation, portal to portal, and allowable longevity.

137.    Plaintiffs Contribution Rate plus earned interest equals what is called the required amount.

138.    The required amount is the amount necessary to remain in the account to receive a retirement benefit with no reduction.

139.    Plaintiffs enjoyed great job security. They were immune from being terminated when there were changes in the administration for example. They could not be terminated without cause. And they were members of labor organizations.

140.    The vast majority of members in the ESU and Bomb Squad do not retire after twenty (20) years.

141.    Plaintiffs worked longer than twenty(20) years.

142.    Plaintiffs received health benefits for themselves and their families.

143.    The City promised to provide health benefits for Plaintiffs' and their families when they retired.

144.    The City is not providing health benefits for Plaintiffs or their families.

145.    Plaintiffs relied on their guaranteed pensions and health benefits when they were hired by the NYPD.

146.    Plaintiffs relied on an anticipated fixed income earned from their pensions to live out the rest of their lives.

147.    They cannot obtain the anticipated amount needed to comfortably retire because Defendants terminated them in violation of the New York State and United States Constitutions.

## CAUSES OF ACTION

COUNT ONE
**VIOLATION OF THE FOURTEENTH AMENDMENT**
**VIOLATION OF NY CONST ART. I §XI**
[Equal Protection Clause]
(Against the City of New York)

148.   Plaintiffs repeat and re-allege every allegation above as though fully set forth herein.

149.    The Fourteenth Amendment's Equal Protection Clause prohibits any State or locality from denying to "any person within its jurisdiction the equal protection of the laws."

150.   NY Const art, I §XI states that "[n]o person shall be denied the equal protection of the laws of this state or any subdivision thereof. No person shall, because of race, color, creed, or religion, be subjected to any discrimination in his or her civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state."

151.   Defendants Adams and Chokshi were the final policy makers for the City of New York and public health mandates for the City, respectively.

152.   The City is a municipal corporation within the State of New York.

153.    Plaintiffs are United States citizens.

154.   Unvaccinated Plaintiffs are similarly situated in all material respect to every other unvaccinated human being living and working in New York City.

155.   Chokshi's classification based on employment status is not rationally related to protecting the public from COVID-19.

156.   Adams' Elite Exemption is not rationally related to protecting the public from the spread of COVID-19.

157.   Instead of ending the disparate treatment, Adams exacerbated it with the Elite Exemption.

158.   Adams could have stopped enforcing the Mandate at any time.

159.   Instead, Adams continued enforcing it until February 6, 2023.

160.   Defendants Adams and Chokshi treated unvaccinated Plaintiffs differently from unvaccinated members of the population and the disparate treatment is not rationally related to protecting the public health from COVID-19.

161.   The Mandate was arbitrary and capricious.

162.   The Mandate caused Plaintiffs to feel insignificant, hated, and irreparably harmed their esteem.

163.   The Mandate caused Plaintiffs to suffer emotional pain and anguish every day for about a year.

164.   The City terminated Plaintiffs for not getting the Shot per the Mandate.

165.   The Mandate violated Plaintiffs civil rights pursuant to the Fourteenth Amendment's Equal Protection Clause and its NY Const. art I §XI.

COUNT TWO
**VIOLATION OF THE FOURTEENTH AMENDMENT**
**VIOLATION OF NY CONST ART. I §XI**
[Selective Enforcement]
(Against Defendant Adams and Chokshi)
PURSUANT TO 42 U.S.C. §1983

166.    Plaintiffs repeat and re-allege every allegation above as though fully set forth

herein.

167.    42 U.S.C. §1983 provides that "[e]very person who, under color of any statute,

ordinance, regulation, custom, or usage, of any State or Territory or the District

of Columbia, subjects, or causes to be subjected, any citizen of the United States

or other person within the jurisdiction thereof to the deprivation of any rights,

privileges, or immunities secured by the Constitution and laws, shall be liable to

the party injured in an action at law, suit in equity, or other proper proceeding for

redress."

168.    Defendant Adams and Chokshi were acting under color of law at all times

herein.

169.    At the pleading stage, Plaintiff must only set forth facts plausibly showing that

that (1) compared with others similarly situated, they were selectively treated,

and (2) the selective treatment was motivated by an intention to discriminate on

the basis of impermissible considerations, such as race or religion, to punish or

inhibit the exercise of constitutional rights, or by a malicious or bad faith intent

to injure the person.

170.    Unvaccinated Plaintiffs are similarly situated in all material respect to every

other unvaccinated human being living and working in New York City.

29

171.   Unvaccinated Plaintiffs are also similarly situated to every human being living and working in the City, including Eric Adams and David Chokshi.

172.   The Mandate only applied to Plaintiffs.

173.   The Mandate was only enforced against Plaintiffs.

174.   Adams did not enforce the private sector mandate.

175.   Adams did not enforce it against anyone else.

176.   Adams amended the Mandate to exclude professional athletes and performers.

177.   When an entire population faces the same public health threat, then measures to abate the public health threat must apply to the entire population.

178.   Eric Adams exclusions demonstrated that the Mandate was never about public health.

179.   Defendant was plausibly motivated by direct malice or bad faith  irrespective of vaccine efficacy.

180.   In a City with approximately 8.4 million residents Defendants decided that only City workers, such as Plaintiffs, had to get vaccinated against a Virus that could be transmitted anywhere, by anyone, at any time. During a global public health crisis involving a highly contagious airborne pathogen, the defendants let members of the public decide whether to get vaccinated without any penalty. But the same members of the public had no choice if their employer was the City of New York. Defendants singled out Plaintiffs. They exiled Plaintiffs from their workplace. They took away their salary, full pension, identities, health benefits, esteem, and job security.

181.    Plaintiffs paid a heavy price for refusing compulsory vaccination, while every other unvaccinated person paid no price at all.

182.    Arbitrarily ordering only Plaintiffs to get vaccinated and punishing only them for being unvaccinated, is the epitome of malicious intent. It is also the personification of selective enforcement.

183.    In addition, the plausibility that Defendants were motivated by impermissible considerations or malicious intent skyrockets considering that the Vaccine—as alleged herein—does not stop the transmission of the Virus.

184.    Defendants knew that the Vaccine did not stop transmission but enforced it anyway.

185.    Since there is a complete absence of a rational basis, the only plausible motivation must be driven by impermissible motives. It is binary. Either the motivation is permissible or impermissible. Since there are no permissible reasons only impermissible reasons are left.

186.    Defendant Adams was motivated by impermissible considerations such as socioeconomic status and monetary gain.

187.    Adams Elite Exemption excluded professional athletes and performers because the City profited more from them than Plaintiffs.

188.    Adams' biggest donors owned sports teams as well.[8]

189.    Brooklyn Nets basketball player Kyrie Irving declined the Shot.

---

[8] Jeffery C. Mays and Dana Rubenstein, *Inside New York City's Decision to End Vaccine Mandate for Pro Athletes*, The New York Times, (Mar. 24, 2022), https://www.nytimes.com/2022/03/24/nyregion/vaccine-mandate-kyrie-adams.html. (last accessed October 25, 2023)

190.    Irving even turned down a four-year contract worth over one hundred million dollars because it required him to be vaccinated per the Mandate. [9]

191.    Notably, Irving said he felt stigmatized for his decision *id.*

192.    Eric Adams solved Irving's—and the Nets owner's—dilemma with the Elite Exemption.

193.    More fans would attend Nets games to watch Irving play. Which brought in more revenue for the City.

194.    Plaintiffs did not directly earn revenue for the City.

195.    Professional athletes and performers did generate revenue for the City.

196.    Plaintiffs were not worth as much to the City as players like Irving. Even though, Plaintiffs literally save lives and protect the City. Adams discriminated against Plaintiffs because they were less valuable to him.

197.    Adams' audaciously exempted elites like Mr. Irving while continuing enforcement against Plaintiffs.

198.    Consequently, Adams created a social hierarchy made from the mold of a caste system.

199.    Adams was motivated by malice or a bad faith intention to injure Plaintiffs.

200.    Malicious Intent can be inferred from the natural and probable consequences of his conduct.

---

[9] https://www.espn.com/nba/story/_/id/34672230/gave-4-year-100m-plus-extension-unvaccinated (retrieved January 24, 2023)

201. Adams selectively enforced the Mandate against Plaintiffs to teach them—and everyone else—a lesson as to what happens to people who do not do what he believed to be "the right thing." It was about compliance.

202. Adams used to work for the NYPD.

203. Adams knew that career public servants like Plaintiffs planned their lives around their pensions and health benefits.

204. Adams was consciously aware that ending Plaintiffs' careers would harm them.

205. Adams directly injured Plaintiffs by stealing their careers and livelihoods.

206. Adams injured Plaintiffs to prove his point, flex his power, and to show who was in charge.

207. His continued enforcement of the Mandate until February 2023 also demonstrates bad faith and an intent to injure Plaintiffs.

208. Adams was also plausibly motivated by self-preservation.

209. After years of touting a vaccine as "safe and effective," claiming that it stopped transmission, running constant ads, and telling the public to get vaccinated, Eric Adams—along with Chokshi—have influenced an enormous amount of people to get the Shot.

210. Adams' continued the same vaccination campaign since he took office.

211. Adams' political image would be damaged if he acknowledged countervailing evidence.

212. Chokshi's image would suffer as well, and he would lose all credibility.

213. Chokshi would experience—as Plaintiffs did—what it feels like to be viewed as a hero one day, and a villain the next.

214. Adams and Chokshi therefore ignored evidence that contradicted their assertions to preserve their political and public images.

215. For example, bivalent boosters are not even effective. *See* e.g., <u>Bivalent COVID-19 Vaccines—A Cautionary Tale,</u> The New England Journal of Medicine, [published January 11, 2023].[10]

216. Adams still claims it is.

217. Chokshi and Adams claimed to review all the scientific evidence. However, they only reviewed what fit their narrative.

218. Public perception of the Mayor's and health Commissioner's performance is vital to their careers.

219. These motives are impermissible.

220. Another plausible impermissible motive is that Adams was fiscally motivated to enrich the City by cutting jobs. Terminating Plaintiff, and thousands of City workers relieved the City of its obligation to pay their salaries, health benefits and pensions. Terminating Plaintiffs saved the City millions of dollars.

221. Eric Adams and Defendant Chokshi acted in violation of clearly established federal law. Law that has been well settled since Reconstruction.

222. Defendant Adams' conduct shocks the conscience as well.

---

[10] https://www.nejm.org/doi/full/10.1056/NEJMp2215780 (last accessed November 6, 2023). To reiterate, this is not offered as evidence or substantive proof. It is offered as a good faith basis for Plaintiffs' claims under Fed. R. Civ. P. 11.

223.    Accordingly, Defendants issuance and enforcement of the Mandate violated the Fourteenth Amendment's Equal Protection Clause and NY Const art. I §XI. This violation proximately caused Plaintiff to be harmed.

COUNT THREE
**VIOLATION OF THE FOURTEENTH AMENDMENT**
[Substantive Due Process]
(Against Defendants Adams and Chokshi)
PURSUANT TO 42 U.S.C. §1983

224.    Plaintiffs repeat and re-allege every allegation above as though fully set forth herein.

225.    Plaintiffs have a fundamental right in their cellular biology.

226.    The freedom to control one's cellular biology—without government interference—is deeply rooted in the nation's history, tradition, and consciousness.

227.    There is nothing more fundamental, more inalienable, than human beings' right to control their cellular biology. It is quite literally what human beings are made from.

228.    The Mandate interfered with Plaintiffs' fundamental right to control their cellular biology.

229.    The Mandate infringed on their fundamental right because the Vaccine artificially manipulated their cells—constituting the building blocks of life—to produce a spike protein.

230.    The government has a compelling interest in controlling the spread of disease.

231.   The Mandate was not narrowly tailored to controlling the spread of COVID-19.

<center>COUNT FOUR</center>
**<center>VIOLATION OF THE FIFTH AMENDMENT</center>**
<center>[Takings Clause]</center>
<center>(Against the City of New York)</center>

232.   Plaintiffs repeat and re-allege every allegation above as though fully set forth herein.

233.   Generally, to establish whether a regulatory taking has occurred the Court must consider three factors: (1) the economic impact of the regulation on the claimant, (2) the extent to which the regulation has interfered with distinct investment-backed expectations, and (3) the character of the governmental action.

234.   The Mandate forced Plaintiffs to get vaccinated in the name of furthering the public health.

235.   The Mandate placed the entire burden on Plaintiff's shoulders for the public good.

236.   Defendants took away Plaintiffs livelihood for the benefit of the public.

237.   The Mandate impacted Plaintiffs economically because the Defendants took away their salaries and earning capacity.

238.   The Mandate interfered significantly with Plaintiffs expectation to receive a full pension, with annual interest, and health benefits.

239.   The governments action was arbitrary and unreasonable, bearing no substantial relation to the public health.

<center>36</center>

240.  The government did not provide Plaintiffs with just compensation for the takings.

241.  Therefore the Mandate was an unconstitutional taking in violation of the Fifth Amendment's Taking Clause

## REQUEST FOR RELIEF

### Count One

Plaintiffs seeks compensatory damages, damages for backpay, front pay, attorney's fees and pain and suffering in the amount of approximately fifty million dollars ($50,000,000.00).

### Count Two

Plaintiffs seeks damages for backpay, front pay, attorney's fees, punitive damages, other monetary damages incidental thereto, and non-economic damages in an amount of approximately twenty-five million dollars ($25,000,000.00).

### Count Three

Plaintiffs seeks compensatory damages and other monetary damages incidental thereto, and attorney's fees in an amount exceeding one hundred thousand dollars ($100,000.00).

### Count Four

Plaintiffs seek declaratory judgment that the Mandate violated the Fifth Amendment's Takings Clause and an Order awarding Plaintiffs a sum of money equal to just compensation.

CERTIFICATION & CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best

of my knowledge, information, and belief that this complaint: (1) is not being

presented for an improper purpose, such as to harass, cause unnecessary delay,

or needlessly increase the cost of litigation; (2) is supported by existing law or by

a nonfrivolous argument for extending, modifying, or reversing existing law; (3)

the factual contentions have evidentiary support or, if specifically so identified,

will likely have evidentiary support after a reasonable opportunity for further

investigation or discovery; and (4) the complaint otherwise complies with the

requirements of Rule 11.


Dated:        November 6, 2023
              Uniondale, NY

                                        Respectfully Submitted,


                                        CHAD J. LAVEGLIA ESQ.,
                                        LAW OFFICE OF CHAD J LAVEGLIA PLLC
                                        626 RxR Plaza, Suite #613
                                        Uniondale, NY 11556
                                        (631) 450-2468
                                        claveglia@cjllaw.org